Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIC HARR, BRYAN HARR, THOMAS DILORENZO, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMPIO PHARMACEUTICALS, INC., MICHAEL MACALUSO, MARK D. MCGREGOR, GREGORY A. GOULD, VAUGHAN L. CLIFT,<br><br>Defendants. | No: CV-15-3474-TJH<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>(consolidated with CV 15-3640)<br><br>JURY TRIAL DEMANDED |

Lead Plaintiffs Eric Harr and Bryan Harr and named plaintiff Thomas DiLorenzo, (collectively, “Plaintiffs”) individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included,

among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ampio Pharmaceuticals, Inc. ("Ampio" or the "Company"), analysts' reports and advisories about the Company, interviews with witnesses, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased the common stock of Ampio between January 13, 2014 and August 21, 2014, inclusive (the "Class Period"), including those who purchased Ampio common stock pursuant and/or traceable to the Company's secondary public offering on or about February 28, 2014, seeking to recover compensable damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Ampio is a small cash strapped biopharmaceutical company focused primarily on the development of therapies to treat prevalent inflammatory conditions for which there are limited treatment options. Throughout the Class Period, Ampio had between 16-20 employees.

3. Ampio's two lead product candidates in development are Ampion for osteoarthritis of the knee ("OAK") and Optina for diabetic macular edema.

4. Ampio's quest for U.S. Food and Drug Administration ("FDA") approval for Ampion to treat OAK has been long and expensive. Initial phase one clinical trial results were released in October 2011.

5. Ampio had devised a two pronged approach to submit a Biologics License Application ("BLA") to the FDA for the approval of Ampion to treat OAK. The first prong was the SPRING clinical study, the results of which were announced

on August 2013. The results were purportedly positive. The second step of the BLA was the Company's STEP clinical study.

6. Because Ampio did not generate any meaningful revenue, throughout its existence it relied on equity and debt financing to fund operations and research. Ampio consistently burned through the cash and racked up losses.

7. Leading up to the Class Period Ampio relied on sales of its common stock to fund continuing operations and its studies. In July 2012, Ampio raised $15.4 million to fund its clinical trials and operations.

8. In September 2013, on the heels of purportedly positive results from the SPRING study announced in August 2013, Ampio raised an additional $25 million to fund its clinical trials and operations.

9. However, the September 2013 offering documents warned that even after the $25 million raise, Ampio will "require[] significant additional financing to continue to fund our operations." The September 2013 offering documents also warned investors that it would become increasingly difficult to raise funds and maintain its listing on the NYSE MKT if the Company's stock price did not maintain pricing above $3/share.

10. By December 31, 2013, Ampio had an accumulated deficit of $64 million. By March 31, 2014, Ampio's accumulated deficit was $74 million.

11. Thus, Ampio was under constant pressure to deliver good news and meet previously announced targets so that it could continue to raise funds from investors.

12. Against this backdrop, throughout the Class Period Defendants issued false statements and/or failed to disclose that the STEP study was materially and negatively impacted because the results would be delayed, the results would not follow the analysis as set forth in the protocol, and the results would have no utility because (a) on or before January 13, 2014, the trial drug supply-Ampion-was shipped to the clinical site at lower temperatures than specified - i.e., the drug supply was

frozen during shipment which impacted over 70% of the drug supply; (b) contrary to the Company's public statements, the STEP trial was conducted at only one site run by Dream Team Clinical Research; and (c) Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and Dream Team Clinical Research's door directed all visitors to Dr. Vo's office in the event it was locked.

13. Rather than come clean, throughout the Class Period Defendants continued to reiterate that the STEP study was on track, on schedule, and producing important results, which were all stated in order to raise much needed funds.

14. For example, on February 18, 2014, the Company issued a materially false and misleading announcement that it had completed enrollment in the STEP study and that the STEP study was on track to produce important results.

15. On the heels of this positive news, on February 24, 2014, the Company announced a public offering of common stock (the "Offering"). Ampio was able to sell 9.775 million shares and raised gross proceeds of $68 million—Ampio's largest offering to date.

16. On August 21, 2014, Ampio announced a delay in the data analysis of the STEP study due to temperature deviations in the Ampion that was shipped to the clinical site for the STEP study.

17. This adverse news shocked the market and caused Ampio's stock price to fall $1.80/share, or 24% on August 21, 2014.

18. On August 22, 2014, the blog *Buyerstrike* issued a report that further questioned the utility of the results of the STEP study. The report revealed for the first time, that contrary to Ampio's public statements, the STEP study was conducted at only one site, and that the principal investigator, Dr. Vo, and Ampio's contract research organization Dream Team Clinical Research lacked independence.

19. That same day, an analyst from the investment bank Jefferies downgraded Ampio stock from "Buy" to "Hold."

20. The adverse news on August 22, 2014 caused Ampio's stock to decline 14%.

21. Ultimately on September 2, 2014, Ampio effectively admitted that the STEP study had no utility because Ampio admitted that it would not be submitting the STEP study results to support efficacy of Ampion in its BLA.

22. This adverse news caused Ampio's stock to fall 4.2% on September 2, 2014, 6% on September 3, 2014, and an additional 7.6% on September 4, 2014.

## JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to: §§10(b) and 20(a) of the Securities Exchange Act ("Exchange Act") (15 U.S.C. §78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5); and Sections 11 and 15 of the Securities Act of 1933 ("Securities Act") (15 U.S.C. §77k and §77o), and the rules and regulations promulgated thereunder by the SEC.

24. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §27 of the Exchange Act, and § 77v(a) of the Securities Act.

25. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), §22(a) of the Securities Act (15 U.S.C. §77v), and 28 U.S.C. §1391(b) as Defendants conduct business in this District.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

27. Lead Plaintiffs Eric Harr and Bryan Harr purchased Ampio common stock securities at artificially inflated prices during the Class Period and were

damaged upon the revelation of the alleged corrective disclosures. Their PSLRA certifications were previously filed with the Court and are incorporated by reference herein.

28. Plaintiff Thomas DiLorenzo ("DiLorenzo") purchased shares pursuant and/or traceable to the Company's secondary public offering that occurred on or about February 28, 2014, and suffered damages. Plaintiff DiLorenzo's PSRLA certification is filed herewith and incorporated by reference.

29. Defendant Ampio is a Delaware corporation headquartered in Englewood, Colorado. It is a development stage biopharmaceutical company, which focuses on developing therapies for the treatment of prevalent inflammatory conditions in the United States. During the Class Period, the Company's stock traded on the NYSE Market ("NYSE MKT").

30. Defendant Michael Macaluso ("Macaluso") has been the Company's Chief Executive Officer ("CEO") and Chairman of the Board at all relevant times. Macaluso was appointed CEO in January 2012. Prior to Ampio, Macaluso served as CEO of Isolagen, Inc.—a bankrupt development stage biotechnology company—from 2001 until 2004. Macaluso was sued by Isolagen shareholders for securities fraud in connection with fraudulent statements about Isolagen's cellular therapy in connection with a public offering of stock. Macaluso's motion to dismiss the action was denied. *See Gargiulo v. Isolagen, Inc.*, 5278 F.Supp.2d 384 (E.D. Pa. 2007). Macaluso ultimately agreed to settle the action for $4.425 million.

31. Defendant Mark D. McGregor ("McGregor") served as the Company's Chief Financial Officer ("CFO") from April 2011 until June 2014.

32. Defendant Gregory A. Gould ("Gould") has been the Company's CFO since June 2014. From 2006 until 2012, Gould served as CFO, and later as CEO in 2012, of SeraCare Life Sciences—a bankrupt development stage biotechnology

company. SeraCare was sued by shareholders for securities fraud in connection with a public offering of stock.

33. Defendant Vaughan L. Clift ("Clift"), a medical doctor, has been Ampio's Chief Regulatory Affairs Officer. Clift joined Ampio in March 2010.

34. Macaluso, McGregor, Gould, and Clift are sometimes referred to herein as the "Individual Defendants."

35. Defendant Ampio and the Individual Defendants are referred to herein, collectively, as the "Defendants."

36. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. was directly involved in the day-to-day operations of the Company at the highest levels;

c. was privy to confidential proprietary information concerning the Company and its business and operations;

d. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f. was aware of, or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g. approved or ratified these statements in violation of the federal securities laws.

37. Ampio is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior*, and common law principles of

agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment and with the authorization of Ampio.

38. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Ampio under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Background

39. Ampion is a biologic that the Company is developing to treat OAK. According to the Company, Ampion is believed to reduce inflammation and pain.

40. Ampio had a two pronged approach in order to obtain FDA approval for Ampion to treat OAK.

41. The first was the SPRING study. The SPRING study was a U.S. multicenter randomized, double-blind, placebo controlled trial designed to evaluate the safety and efficacy of Ampion in OAK patients. 329 patients were randomized to receive one of two doses (4 mL or 10 mL) of Ampion or corresponding saline placebo control via intra-articular injection. The primary study objective was to evaluate the relative efficacy of Ampion 4 mL versus Ampion 10 mL. The primary endpoint was the mean change in pain from baseline for Ampion compared to the same volume of saline. Secondary endpoints included evaluating safety and disease severity, as well as stiffness and function. Ampio claimed the results from the SPRING study were positive.

42. The second prong was the "final pivotal" trial, the STEP study, which was to begin in early January 2014. The STEP study purportedly included the same clinical sites as the SPRING study and additional new sites.

43. Because of the extreme importance of the SPRING study, the study execution and progress was closely monitored by the Individual Defendants.

**False and Misleading Statements**

44. The Class Period begins on January 13, 2014 the Company issued a press release entitled, "Ampio Injects First Patients in 2nd Phase III, Pivotal Clinical Trial For Ampion (The Step Study) for Its FDA Biological License Application." The announcement, quoting Defendant Clift, provided additional detail about the STEP study and the overlap of clinical sites from the SPRING study:

> Dr. Vaughan Clift, Ampio's Chief Regulatory Officer, explained "This phase III, final pivotal clinical trial is a randomized, placebo (vehicle control)-controlled, double-blind study in which 500 patients with osteoarthritis (OA) of the knee will be randomized to AmpionTM 4 ml intra-articular injection or a 4 ml saline vehicle control. Similar to the initial Phase III trial (SPRING study) the Primary end point will be assessed at 12 weeks following a single injection, however we will follow patients for twenty (20) weeks. The clinical effects of treatment on OA pain will be evaluated during clinic visits at 6, 12 and 20 weeks using WOMACR osteoarthritis index and Patient's Global Assessment (PGA) of disease severity. Patient safety will be monitored by recording adverse events, concomitant medications, physical examination, vital signs and laboratory tests. In addition, a parallel study of a subpopulation of the patients will be subjected to Magnetic Resonance Imaging (MRI) and testing of serum biomarkers to evaluate signs of knee cartilage regeneration. The study will include eight (8) new clinical sites additional to the nine (9) sites previously utilized in the SPRING study."

45. The January 13, 2014 press release was materially false and misleading for the following reasons: (1) the trial drug supply—Ampion—was shipped to the clinical site at lower temperatures than specified – *i.e.*, the drug supply was frozen which impacted over 70% of the drug supply; (2) freezing of the Ampion negatively impacted the clinical trial; (3) as a result, the STEP study clinical results were delayed; (4) any clinical results obtained were not be reliable since they would

materially inhibit Ampio's ability to conduct statistical analysis according to the plan; (5) as a result, the clinical results had no utility in demonstrating the requisite efficacy in support of the BLA; (6) contrary to the Company's public statements, the STEP trial was conducted at only one site, run by Dream Team Clinical Research; and (7) Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and Dream Team Clinical Research's door directed all visitors to Dr. Vo's office in the event it was locked.

46. On February 14, 2014, the Company filed a Form 10-K for the fiscal year ended December 31, 2013 (the "2013 10-K") with the SEC, which was signed by Defendants Macaluso and McGregor. The 2013 10-K, like the January 13, 2014 press release, had similar disclosures relating to the STEP study which noted that "Topline results are anticipated in the third quarter of 2014." The 2013 10-K stated in relevant part:

> Ongoing STEP Pivotal Trial
>
> On January 13, 2014, we announced the first patient injection in the Phase III final pivotal clinical trial of Ampion for the treatment of osteoarthritis of the knee. The Phase III STEP study has been designed to enroll 500 patients and the primary endpoint is reduction in pain for patients treated with Ampion compared to vehicle control at 12 weeks. STEP is a randomized, placebo-controlled, double-blind study in which patients with osteoarthritis knee pain will be randomized to receive either a 4 mL single injection of Ampion or saline control. The clinical effects of treatment on osteoarthritic pain will be evaluated during clinic visits at 6, 12, and 20 weeks using WOMAC Osteoarthritis Index and the PGA. Safety will be assessed by recording adverse events, concomitant medications, physical examination, vital signs and clinical laboratory tests. Topline results are anticipated in the third quarter of 2014.

47. The above statements in the 2013 10-K were materially false and misleading for the following reasons: (1) the trial drug supply—Ampion—was shipped to the clinical site at lower temperatures than specified – *i.e.*, the drug supply was frozen which impacted over 70% of the drug supply; (2) freezing of the Ampion negatively impacted the clinical trial; (3) as a result, the STEP study clinical results were delayed; (4) any clinical results obtained were not be reliable since they would materially inhibit Ampio's ability to conduct statistical analysis according to the plan; (5) as a result, the clinical results had no utility in demonstrating the requisite efficacy in support of the BLA; (6) contrary to the Company's public statements, the STEP trial was conducted at only one site, run by Dream Team Clinical Research; and (7) Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and its door directed all visitors to Dr. Vo's office in the event it was locked.

48. The 2013 10-K also revealed that Ampio had retained a clinical research organization to conduct the STEP study. The 10-K stated in relevant part:

> In January 2014, Ampio entered into an agreement with a clinical research organization to conduct its 500 patient Phase III pivotal trial of Ampion for the treatment of osteoarthritis of the knee. The contract fees total $4.7 million and extend over approximately ten months.

49. The above statement in the 2013 10-K was materially false and misleading because Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and its door directed all visitors to Dr. Vo's office in the event it was locked.

50. On February 18, 2014, the Company issued a press release announcing it completed enrollment and dosing of the STEP study. The press release, entitled "Ampio Completes Enrollment and Dosing in 2nd Pivotal Clinical Trial for

Ampion™ (The STEP Study) for Its FDA Biological License Application (BLA)" stated in relevant part:

> Dr. Vaughan Clift, Ampio's Chief Regulatory Officer, explained: "This phase III, final pivotal clinical trial is a randomized, placebo (vehicle) controlled, double-blind study in which 500 patients with osteoarthritis (OA) of the knee were randomized to 4 ml intra-articular injection of AmpionTM, or a 4 ml saline vehicle control. Similar to the initial pivotal trial (SPRING study) the primary end point is at 12 weeks, with a follow up evaluation at 20 weeks. The clinical effects of treatment on OA pain will be evaluated during clinic visits at 6, 12 and 20 weeks using WOMACR osteoarthritis index and Patient's Global Assessment (PGA) of disease severity. Patient safety will be monitored by recording adverse events, concomitant medications, physical examination, vital signs and laboratory tests. In addition, a parallel study of a subpopulation of the patients will be subjected to Magnetic Resonance Imaging (MRI) and testing of serum and synovial fluid biomarkers to evaluate signs of knee cartilage regeneration."

51. In the same announcement, Defendant Macaluso reiterated that the STEP study was on track to be complete and final by the third quarter of 2014. The announcement stated in relevant part:

> Ampio CEO Michael Macaluso reported that: "The Company is on track to complete this final AmpionTM clinical trial within the timeline previously announced and we expect to file the BLA later this year. The manufacturing facility is expected to begin production of test batches of AmpionTM early this summer."

52. The February 18, 2014 press release was materially false and misleading for the following reasons: (1) the trial drug supply—Ampion—was shipped to the clinical site at lower temperatures than specified – *i.e.*, the drug supply was frozen which impacted over 70% of the drug supply; (2) freezing of the Ampion negatively impacted the clinical trial; (3) as a result, the STEP study clinical results were

delayed; (4) any clinical results obtained were not be reliable since they would materially inhibit Ampio's ability to conduct statistical analysis according to the plan; (5) as a result, the clinical results had no utility in demonstrating the requisite efficacy in support of the BLA; (6) contrary to the Company's public statements, the STEP trial was conducted at only one site, run by Dream Team Clinical Research; and (7) Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and Dream Team Clinical Research's door directed all visitors to Dr. Vo's office in the event it was locked.

53. On the heels of this apparently string of positive news, on February 24, 2014, the Company announced a public offering of common stock (the "Offering"). The proceeds of the Offering were to be used for the continuation and completion of the Company's clinical trials and for working capital. The Company announced that it intended to offer up to 8 million shares of common stock.

54. On February 27, 2014, the Company announced the pricing of its offering at $7.00/share and increased the number of shares offered to 8.5 million.

55. On March 5, 2014, Ampio announced the closing of its successful offering which had ballooned to 9.775 million shares and gross proceeds of $68 million.

56. On March 13, 2014, the Company held a teleconference with investors. During the call, Defendant Clift confirmed that all the injections were done in the STEP study and that the results of the STEP study were to be released on schedule as previously announced. Clift said in relevant part:

> We've now moved into the STEP study. We've completed the enrollment. We've done all the injections. We're actually on schedule for results to be available in June-July timeline. We're going to combine these with data from our production runs from our facility and then we'll file our BLA in the third quarter, which will mean the

> BLA will be granted sometime in 2015, early 2015 and will provide us 12 years of exclusivity on the present FDA guidance.

57. Clift's March 13, 2014 statements were materially false and misleading because: (1) the trial drug supply—Ampion—was shipped to the clinical site at lower temperatures than specified – *i.e.*, the drug supply was frozen which impacted over 70% of the drug supply; (2) freezing of the Ampion negatively impacted the clinical trial; (3) as a result, the STEP study clinical results were delayed; (4) any clinical results obtained were not be reliable since they would materially inhibit Ampio's ability to conduct statistical analysis according to the plan; (5) as a result, the clinical results had no utility in demonstrating the requisite efficacy in support of the BLA; (6) contrary to the Company's public statements, the STEP trial was conducted at only one site, run by Dream Team Clinical Research; and (7) Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and Dream Team Clinical Research's door directed all visitors to Dr. Vo's office in the event it was locked.

## The Truth Emerges Through Partial Corrective Disclosures; Damaging Class Members

58. On August 21, 2014, the Company issued a press release announcing a delay in the data analysis of the STEP Study due to the discovery by the independent Clinical Research Organization ("CRO") that the study drugs (both Ampion and the placebo) were, during shipment to the clinical site in early January 2014, exposed to lower temperatures than permitted by the drug specifications. The press release stated in part:

> **Ampio reports that due to temperature deviations below product specifications during shipments to the Ampion™ STEP Study clinical sites, release of data will be delayed**.

ENGLEWOOD, CO., August 21,2014 /PRNewswire/ — Ampio Pharmaceuticals, Inc. (NYSE MKT: AMPE) today announced a delay in the data analysis of the STEP Study due to the discovery by the independent Clinical Research Organization (CRO) that the study drug (both AmpionTM and the placebo) were, during shipment to the clinical sites, exposed to lower temperatures than permitted by the drug specifications

Michael Macaluso, Ampio's CEO, explained "Pivotal clinical trial drug specifications dictate precise temperature and handling conditions for all study drug product in order to assure that the conclusions about the safety and effectiveness of the tested drugs will be accurate and repeatable during routine clinical use. During the review of all documentation following the unblinding of the Study, our CRO determined that there were multiple instances where the in-package temperature monitor fell significantly below the 15$^{o}$C minimum required.

Although our entire trial drug supply was housed, packaged, and shipped in early January by a specialized drug shipment vendor contractually obligated to maintain pre-determined temperature requirements under all conditions, our CRO discovered much of the drug product received at the clinical sites had been below the temperature requirement and may have been frozen for some period of time.  The drug temperature specifications were set because AmpionTM may lose potency if it is exposed to temperatures approaching freezing. We have contacted the FDA who has agreed to analyze the STEP trial as supportive data for our BLA."

Mr. Macaluso concluded, "Although we are frustrated by these shipping and receiving deviations of the Step Study protocols, the company is pursuing alternative solutions to meeting the requirements for filing a Biologic License Application (BLA) for AmpionTM on schedule.  We are consulting with our regulatory advisors about substituting the data from our Multiple Injection (MI) Study that is currently underway. The compilation of data from the "SPRING" single injection study and the MI study may provide a more comprehensive and clinically meaningful analysis by the FDA

> reviewers. If the MI study confirms the 85+% reduction in pain reported by the initial patients, it is unlikely that physicians will choose to treat the severe chronic pain experienced by Kellgren Lawrence Grades 3 and 4 OA patients with a single injection. The "Indications for Use" and improved efficacy over placebo, provided by multiple injections, should be of greatest interest to the FDA and the physician community, who are trying to improve the quality of life of their patients."

59. On this news, shares of Ampio fell $1.80 per share, or over 24%, to close at $5.66 per share on August 21, 2014, damaging investors.

60. On August 22, 2014, the blog *Buyerstrike* issued a report on Ampio, which asserted a number of red flags with the STEP Study, including that: (1) the study was conducted at only one site in Anaheim, California with only one doctor supervising it, even though it enrolled 500 patients; and (2) Dream Team Clinical Research lacked independence as its office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and Dream Team Clinical Research's door directed all visitors to Dr. Vo's office in the event it was locked. A copy of the posting is attached as Exhibit 1 and is incorporated herein.

61. Plaintiffs corroborated the *Buyerstrike* report's finding that only one clinical site was listed for the STEP study. As of February 5, 2016, ClinicalTrials.gov, a service of the U.S. National Institutes of Health, likewise lists only one site.

62. On August 22, 2014, Jefferies downgraded its rating on Ampio to "Hold" from "Buy."

63. As a result of the August 22, 2014 adverse disclosures, shares of Ampio fell $0.82 per share, or over 14%, to close at $4.84 per share on August 22, 2014, further damaging investors.

64. On August 25, 2014, Ampio released a shareholder letter providing additional details about the STEP study. The letter revealed that: (a) over 70% of the

drug supply deviated from the temperature range specified in the STEP study protocol; (b) freezing of the drug supply likely decreased the amount of Ampion that was provided to patients and in a solution form that was not properly mixed; (c) Ampio would not repeat the STEP study; and (d) Ampio did not know whether it would include the results of the STEP study to support the BLA.

65. The shareholder letter claimed that because Ampio took a "hands off" approach, it did not immediately know of the temperature deviations.

66. To the extent that either the August 21, 2014 press release and the August 25, 2014 shareholder letter, or both, suggest that Defendants were not aware of, did not have access to, and/or did not deliberately turn a blind eye to the temperature deviations at the time they occurred in early January 2014, Defendants August 21st and 25th statements were materially false and misleading.

67. The STEP study protocol required the active monitoring and reporting of the temperature range of the drug supply that was shipped to the clinical site.

68. Ampio's protocols, policies, and practices, mandated that research personnel contact and notify Ampio of any temperature deviations that are detected with shipments. Witness No. 1 ("W1"), is a former Research Assistant for Ampio between January 2014 to November 2014. W1 was aware of Ampio's policies and procedures relating to temperature deviations of clinical drugs as W1 worked on Ampio's Optina study. W1 reported to Ampio's principal investigator, Michael A. Singer. According to W1:

a. Ampio has a "pretty full proof" system for tracking drug temperatures during shipment to clinical sites.

b. Temperatures were monitored and logged during transit through a temperature monitor. The temperature monitor actively records the ambient temperature of the drug, including any fluctuations. The temperature data would then be accessed on delivery through a USB

connection which would yield a read out of the temperature ranges during transit.

c. Protocol required that clinical personnel download the temperature monitor data immediately upon delivery and receipt of the study drugs and to report that data immediately to Ampio. If temperature deviations were outside of the required specified range, the shipment would be quarantined, Ampio would be notified, and further instructions would be provided by Ampio to the clinical study site.

69. In connection with Plaintiffs' investigation, Plaintiffs consulted with a regulatory expert, Nancy Chew. Nancy Chew has provided Plaintiffs with scientific and regulatory advice, guidance, and an opinion as to Ampio's Class Period statements. Nancy Chew is the president of Regulatory Affairs North America, Inc. In this capacity, she guides companies through the regulatory process for drugs and devices, and has successfully been doing so for over thirty-five years. She has published journal articles, book chapters, and various magazine articles and columns on the regulatory approval process. Her resume is attached as Exhibit 2 of to this Complaint. According to Ms. Chew:[1]

a. Ampio's excuse that it took a "hands off" approach and thus failed to learn of the temperature deviations earlier is implausible and contrary to industry practice.

b. In the STEP study Defendant Clift, Ampio's Chief Regulatory Officer, would have received reports from and been aware of communications between Ampio and the clinical research organization, (here the Dream Team Clinical Research) including specifically the principal clinical investigator (Dr. Vo). Clift would have also maintained frequent contact

---

[1] As to the number of sites for the STEP study, Ms. Chew confirmed that the number of sites would be listed on ClinicalTrials.gov.

with clinical research associates. Clift would also responsible for monitoring compliance with the protocol and compliance with FDA regulations in connection with the STEP study. FDA regulations require a medical monitor. Clift would also be the main liaison between Ampio senior management and the Dream Team Clinical Research.

c. Given the importance of the STEP study, and Ampio's public statements about the progress of the STEP study which demonstrates continued and close monitoring by Ampio, in Ms. Chew's opinion, it is implausible that Ampio would not have known of the temperature deviations soon after the arrival of the drug supply at the clinical site.

70. On September 2, 2014, Ampio issued an announcement providing additional information about the STEP study. The announcement revealed: (a) 72% of the patients received Ampion that had fallen below the product specification range; (b) the average length of exposure below the temperature range was 16.1 hours, with the maximum 36.3 hours; (c) temperature deviation adversely impacted Ampio's ability to conduct statistical analysis according to plan; and (d) efficacy data from the STEP study would not be used to support the BLA for Ampion.

71. On this adverse news, Ampio's stock fell 4.2% on September 2, 2014, 6% on September 3, 2014, and fell an additional 7.6% on September 4, 2014.

72. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

73. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Ampio common stock traded on the NYSE MKT during the Class Period; and were damaged upon the revelation of the alleged

corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

74. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ampio securities were actively traded on the NYSE MKT. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ampio or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

77. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ampio;
- whether the Individual Defendants caused Ampio to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Ampio common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Fraud on the Market Presumption of Reliance**

79. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
b. the omissions and misrepresentations were material;
c. Ampio common stock was traded in an efficient market:

i. Ampio's stock met the requirements for listing and was and is listed and actively traded on the NYSE MKT, an efficient and automated market;

ii. Weekly turnover in the Ampio stock trading was substantial during the Class Period;

iii. Ampio was eligible and did file short-form registration statements with the SEC on Form S-3 during the Class Period;

iv. Ampio was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period;

v. Numerous NASD member firms were active market-makers in Ampio stock during the Class Period;

vi. Unexpected material news about Ampio was rapidly reflected and incorporated into the Company's stock price during the Class Period;

80. As a result of the foregoing, the market for Ampio's common stock promptly digest current information regarding Ampio from all publicly available sources and reflected such information in Ampio's stock price. Under these circumstances, all purchasers of Ampio's common stock during the Class Period suffered similar injury through their purchase of Ampio's common stock at artificially inflated prices, and a presumption of reliance applies.

**_Affiliated Ute_ Presumption of Reliance**

81. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants

omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Against All Defendants**

82. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

83. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

84. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ampio common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Ampio common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

85. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other

statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ampio common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ampio's finances and business prospects.

86. By virtue of their positions at Ampio, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

87. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Ampio stock from their personal portfolios.

88. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Ampio, the Individual Defendants had knowledge of the details of Ampio's internal affairs.

89. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Ampio. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful

information with respect to Ampio's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price for Ampio's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ampio's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased Ampio common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged upon the revelation of the alleged corrective disclosures.

90. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases by Plaintiffs and the Class, the true value of Ampio common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Ampio's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

91. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

92. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violation of Section 20(a) of The Exchange Act Against The Individual Defendants

93. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94. During the Class Period, the Individual Defendants participated in the operation and management of Ampio, and conducted and participated, directly and indirectly, in the conduct of Ampio's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Ampio's business practices.

95. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ampio's financial condition and results of operations, and to correct promptly any public statements issued by Ampio which had become materially false or misleading.

96. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ampio disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ampio to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ampio within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ampio common stock.

97. Each of the Individual Defendants, therefore, acted as a controlling person of Ampio. By reason of their senior management positions and/or being directors of Ampio, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ampio to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control

over the general operations of Ampio and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

98. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ampio.

**COUNT III**

**Violation of Section 11 of The Securities Act**
**Against Defendants Ampio, Macaluso, McGregor, Clift**

99. This Count is asserted against defendants Ampio, Macaluso, McGregor, and Clift ("Count III Defendants").

100. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101. This Count is based on Count III Defendants' lack of reasonable care and strict liability for making false statements of material fact the Company's registration statement/prospectus in connection with the public offering that occurred on or about February 28, 2014.

102. On February 24, 2014 the Company announced the Offering. The proceeds of the Offering were to be used for the continuation and completion of the Company's clinical trials and for working capital. The Company announced that it intended to offer up to 8 million shares of common stock. On February 27, 2014, the Company announced the pricing of its offering at $7.00/share and increased the number of shares offered to $59.5 million.

103. On February 28, 2014, Ampio filed its Prospectus for the Offering. The prospectus contained the similar statements noted in the Company's prior public

statements about the STEP study and the timeframe for results. The prospectus states in relevant part:

> *Ongoing STEP Pivotal Trial.*
>
> On January 13, 2014, we announced the first patient injection in the Phase III final pivotal clinical trial of Ampion for the acute treatment of osteoarthritis of the knee. The Phase III STEP study has been designed to enroll 500 patients and the primary endpoint is reduction in pain for patients treated with Ampion compared to saline placebo control at 12 weeks. STEP is a randomized, placebo-controlled, double-blind study in which patients with osteoarthritis knee pain will be randomized to receive either a 4 mL single injection of Ampion or saline placebo control. The clinical effects of acute treatment on osteoarthritic pain will be evaluated during clinic visits at 6, 12, and 20 weeks using WOMAC® osteoarthritis Index and the PGA. Safety will be assessed by recording adverse events, concomitant medications, physical examination, vital signs and clinical laboratory tests. On February 18, 2014, we announced the completion of enrollment and dosing of 500 patients. Topline results are anticipated in the third quarter of 2014.

104. The February 28, 2014 Prospectus and related registration statement contained false statements of material fact because: (1) the trial drug supply—Ampion—was shipped to the clinical site at lower temperatures than specified – *i.e.*, the drug supply was frozen which impacted over 70% of the drug supply; (2) freezing of the Ampion negatively impacted the clinical trial; (3) as a result, the STEP study clinical results were delayed; (4) any clinical results obtained were not be reliable since they would materially inhibit Ampio's ability to conduct statistical analysis according to plan; (5) as a result, the clinical results had no utlity in demonstrating the requisite efficacy in support of the BLA; (6) contrary to the Company's public statements, the STEP trial was conducted at only one site, run by Dream Team Clinical Research; and (7) Dream Team Clinical Research lacked independence as its

office was located next door to Dr. Quang D. Vo, the principal investigator of the trial, and Dream Team Clinical Research's door directed all visitors to Dr. Vo's office in the event it was locked.

105. Plaintiff DiLorenzo purchased Ampio common stock in the Offering pursuant to the Company's registration statement/prospectus.

106. This claim is brought by Plaintiff DiLorenzo on his own behalf and on behalf of other members of the Class who acquired Ampio common stock shares pursuant to or traceable to the Company's Offering. Each Class Member acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Offering documents. Ampio is the issuer of the securities through the Offering documents.

107. Count III Defendants owed to the purchasers of the common stock obtained through the Offering documents the duty to make a reasonable and diligent investigation of the statements contained in the Offering documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

108. None of the Count III Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering documents were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

109. Count III Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Offering documents, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, each defendant violated and/or controlled a person who violated Section 11 of the Securities Act

110. At the times they obtained their stock of Ampio, Plaintiff DiLorenzo and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

111. This action is brought within one year after discovery of the untrue statements and omissions in and from the Offering documents that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering documents.

112. By virtue of the foregoing, Plaintiff DiLorenzo and all Class members are entitled to damages under Section 11 as measured by the provisions of the Section 11(e), from the defendants and each of them, jointly and severally.

**COUNT IV**

**Violation of Section 15 of The Securities Act**
**Against Defendants Macaluso, McGregor, and Clift**

113. This Count is asserted against defendants Ampio, Macaluso, McGregor, and Clift ("Count IV Defendants")

114. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115. The Count IV Defendants were control persons of Ampio by virtue of, among other things, their positions as senior officers and directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Offering documents.

116. None of the Count IV Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering documents were accurate and complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

117. This action was brought within one year after the discovery of the untrue statements and omissions in the Offering documents and within three years of Ampio stock was sold to the Class in connection with the Offering.

118. By reason of the misconduct alleged herein, for which Ampio is primarily and strictly liable, as set forth above, the Count IV Defendants are jointly and severally liable with and to the same extent as CBD pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

119. Plaintiffs hereby demand a trial by jury.

Dated: February 8, 2016

Respectfully submitted,
THE ROSEN LAW FIRM, P.A.

/s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Lead Counsel for Lead Plaintiffs

## CERTIFICATE OF SERVICE

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On February 8, 2016, I electronically filed the following **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on February 8, 2016

/s/ Laurence M. Rosen

Laurence M. Rosen